

FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ex rel. AYMAN DAOUK, M.D. ) <br> ) <br> STATE OF FLORIDA ) <br> ex rel. AYMAN DAOUK, M.D., ) <br> ) <br>     Plaintiff-Relator, ) <br> ) <br> v. ) <br> ) <br> ORLANDO HEALTH; PHYSICIAN ) <br> ASSOCIATES, LLC; ORLANDO HEALTH ) <br> PHYSICIAN GROUP, INC; and ORLANDO ) <br> HEALTH IMAGING CENTERS, ) <br> ) <br>     Defendants. ) | Case No. 6:19-cv-825-orl-40 DCI <br> **JURY TRIAL DEMANDED** <br> **FILED UNDER SEAL** |

## VERIFIED COMPLAINT & DEMAND FOR TRIAL

1.    Relator Ayman Daouk, M.D., brings this action on behalf of himself, the

United States of America, and the State of Florida against Defendants Orlando

Health; Physician Associates, LLC ("PAL"); Orlando Health Physician Group

("OHPG"); and Orlando Health Imaging Centers ("OHIC") for violations of the

federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("federal FCA"), and of the Florida

False Claims Act, Fla. Stat. §§ 68.081 *et seq.* ("Florida FCA") (collectively, the "False

Claims Act").

2.    Relator further addresses claims of unlawful whistle-blower retaliation as

prohibited by Florida's Private Sector Whistle-Blower Act ("FWA"), section 448.101,

*et seq.*, Florida Statutes.

3.    Orlando Health—parent company of PAL and OHPG—requires the

physicians employed by PAL and OHPG to refer its patients only to other Orlando Health facilities.

4.     Relator's employment was terminated by PAL, and OHPG reconsidered its decision to employ Relator because he performed surgeries at a non-Orlando Health facility and referred patients for imaging at a non-Orlando health facility.

5.     PAL's mandatory self-referrals violate the Stark Law and federal Anti-Kickback Statute, as well as the patients' freedom of choice.

## JURISDICTION AND VENUE

6.     This court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1345.

7.     This court has personal jurisdiction over Defendants pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) in that Defendants do or transacts business in this jurisdiction and violations of the False Claims Act described herein were carried out in this district.

8.     This court also has supplemental jurisdiction over Relator's FWA claim pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and under 31 U.S.C. § 3732(a).

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

10.     As required by the federal FCA, 31 U.S.C. § 3730(b)(2), and §§ 68.083(3), Florida Statutes, Relator has provided to the Attorney General of the United States, Attorney General of the State of Florida, Chief Financial Officer of the State of

Florida, and the United States Attorney for the Middle District of Florida a statement of all material evidence and information related to the Complaint ("Disclosure Statement").

11.     The Disclosure Statement includes attorney-client communications and work product of Relator's attorneys and is submitted to the Attorney General of the United States Attorney General of the State of Florida, Chief Financial Officer of the State of Florida, and the United States Attorney for the Middle District of Florida in their capacities as potential co-counsel in this litigation; therefore, the Disclosure Statement is confidential and protected by the joint prosecutorial privilege.

## PARTIES

12.     PAL is a physicians' group in Orlando, Florida. Its principal address is 77 W Underwood St., 5th Floor, Orlando, FL 32806.

13.     In late 2012, Orlando Health acquired PAL as part of its clinically integrated network and rebranded it as Orlando Health Physician Associates. The acquisition was completed on the last day of December 2012.

14.     OHPG is a corporation organized and existing under the laws of the State of Florida, with its principal address at 1414 Kuhl Avenue, Orlando, Florida 32806. It is also part of Orlando Health's clinically integrated network.

15.     OHIC is a diagnostic imaging center with MRI, CT scan, and ultrasound capabilities. It is also part of Orlando Health's clinically integrated network.

16.     Orlando Health is an owner of OHIC.

17.     Relator Dr. Ayman Daouk, M.D., is a board-certified orthopedic surgeon living and working in Orlando, Florida.

18.     Relator was employed by PAL from 2009 through December 2018.

19.     During Dr. Daouk's tenure with PAL, he routinely achieved excellent Press Ganey patient satisfaction scores.

20.     During Dr. Daouk's tenure with PAL, he was among the top ten in revenue earners for the practice.

## GOVERNMENT HEALTHCARE PROGRAMS

21.     Title XVIII of the Social Security Act, U.S.C. §§ 1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, known as the Medicare program. The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicine and Medicaid Services ("CMS").

22.     The Medicare program is comprised of four parts. Medicare Part A ("Hospital Insurance") provides basic insurance for the costs of hospitalization and post hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B ("Medical Insurance") is a federally subsidized, voluntary insurance program that covers the fee schedule amount for doctors' services, outpatient care, medical supplies, and laboratory services. 42 U.S.C. §§ 1395j-w-5. Medicare Part C ("Medicare Advantage Plans") is a plan offered by private insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D ("Prescription Drug Coverage") is a plan offered by private insurers approved by Medicare to provide

-4-

basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

23.     Reimbursement for Medicare Part B claims is made by the United States through CMS. CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 421.5(b). Separate payments are made for each CPT procedural code listed on the Medicare Part B claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011, adopting the Current Procedural Terminology Coding Manual published by the American Medical Association (the "CPT Manual").

24.     Reimbursement for Medicare Part C claims is made by the United States through CMS. CMS makes fixed monthly payments to each Medicare Choice organization for each enrolled individual, i.e., a capitated payment.

25.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes the Medicaid program, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services, and administrative and operational procedures.

26.     At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the

provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act.

27.     TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

28.     Veterans of the United States military receive insurance benefits ("VA Insurance") through the Veterans Health Administration, a component of the U.S. Department of Veterans Affairs.

29.     The Federal Employees Health Benefits Program ("FEHBP") provides healthcare benefits for qualified federal employees and their dependents. Under the FEHBP, the federal employee is covered by private payer health insurance which is in turn subsidized in part by the federal government.

30.     The Office of Workers' Compensation Programs ("OWCP") of the U.S. Department of Labor ("DOL") administers federal workers' compensation programs under four statutes: (1) the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. §§ 8101 et seq.; (2) the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 et seq.; (3) the Federal Black Lung Benefits Act ("FBLBA"), 30 U.S.C. §§ 901 et seq.; and (4) the Energy Employees Occupational Illness Compensation Program Act ("EEOIC") (also known as the "Beryllium Exposure Compensation Act"), 42 U.S.C. §§ 7384 et seq.

31.     Together, the programs described above, and any other government-funded

healthcare programs, are referred to as "Government Healthcare Programs."

## THE FEDERAL STARK AND TRICARE CONFLICT OF INTEREST LAWS

32.     Section 1877 of the Social Security Act (42 U.S.C. § 1395nn), also known as

the physician self-referral law and commonly referred to as the "Stark Law,"

prohibits a physician from making referrals for certain designated health services

("DHS"), including clinical laboratory services, radiology services, and inpatient or

outpatient hospital services, payable by Medicare or Medicaid to an entity with

which the physician has a financial relationship, unless an exception applies.

33.     In enacting the statute, Congress found that improper financial relationships

between physicians and entities to which they refer patients can compromise the

physician's professional judgment as to whether an item or service is medically

necessary, safe, effective, and of good quality. Congress relied on various academic

studies consistently showing that physicians who had financial relationships with

medical service providers used more of those providers' services than similarly

situated physicians who did not have such relationships. The statute was designed

specifically to reduce the loss suffered by the Medicare Program due to such

increased questionable utilization of services, but the Stark Law also applies to

Medicaid claims. *See generally United States v. Rogan*, 459 F. Supp. 2d 692, 722-23

(N.D. Ill. 2006).

34.     Under the Stark Law, a physician (or an immediate family member of such

physician) is prohibited from making referrals to an entity with which he or she has

a financial relationship for designated health services payable by Medicare or

Medicaid. In addition, providers may not bill Medicare or Medicaid for designated

health services furnished as a result of a prohibited referral, and no payment may

be made by the Medicare or Medicaid programs for designated health services

provided in violation of 42 U.S.C. § 1395nn(a)(1). *See* 42 U.S.C. §§ 1395nn(g)(1),

1396b(s).

35.     Under the Stark Law, unless the relationship falls under a Safe Harbor, "a

physician who has a direct or indirect financial relationship with an entity, or who

has an immediate family member who has a direct or indirect financial relationship

with the entity, may not make a referral to that entity for the furnishing of DHS for

which payment otherwise may be made under Medicare.... [A] referral made by a

physician's group practice, its members, or its staff may be imputed to the physician

if the physician directs the group practice, its members, or its staff to make the

referral or if the physician controls referrals made by his or her group practice, its

members, or its staff." 42 C.F.R. § 411.353(a).

36.     The Stark Law broadly defines prohibited financial relationships to include a

direct or indirect "ownership or investment interest in the entity" or a direct or

indirect "compensation arrangement," i.e., any remuneration between a physician

and an entity. *See generally* 42 C.F.R. § 411.354(a)(1).

37.     "Compensation arrangements" consist of any remuneration between a

physician and an entity. 42 C.F.R. § 411.354(c). Like ownership interests,

compensation arrangements can be direct or indirect. A direct compensation

arrangement exists if there is no intervening person between the physician (or a

member of his or her immediate family) and the entity providing the DHS. An indirect relationship exists if there is an unbroken chain of persons or entities that have financial relationships (either an ownership or investment interest or a compensation arrangement) between the referring physician (or immediate family member) and the entity conducting the tests, if the referring physicians receives compensation varying with volume or value of referrals, and if the entity furnishing the DHS has actual knowledge, or acts in reckless disregard or deliberate ignorance, of the fact that the referring physician is receiving compensation varying with the volume or value of referrals. 42 C.F.R. § 411.354(b)(5), (c)(2).

38. Violations of the Stark Law may subject the physician and the billing entity to exclusion from participation in Government Healthcare Programs and various financial penalties, including: (a) a civil money penalty of up to $15,000 for each service included in a claim for which the entity knew or should have known that the payment should not be made; and (b) an assessment of three times the amount claimed for a service rendered pursuant to a referral the entity knows or should have known was prohibited. *See* 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

39. TRICARE will likewise deny any claim where an individual contracted to the United States Government has the "apparent or actual opportunity to exert, directly or indirectly, any influence on the referral of [TRICARE] beneficiaries to himself/herself or others with some potential for personal gain or the appearance of impropriety." 32 C.F.R. § 199.9(d)(1). Claims subject to "conflict of interest" in this way will be denied. 32 C.F.R. § 199.9(d)(2). For ease of reference, the Stark Law and

the TRICARE regulations will be collectively referred to as "the Stark Laws" in this Complaint.

## ANTI-KICKBACK STATUTE

40.    The Anti-Kickback Statute (AKS) prohibits the knowing and willful offering, paying, solicitation, or receipt of remuneration in cash or in kind to induce or reward patient referrals or the generation of business involving any item or service payable by Federal Insurance, including Medicaid, Medicare, and Tricare. 42 U.S.C. §1320a–7b.

41.    Pursuant to the AKS, a claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

42.    Compliance with the Anti-Kickback Statute is material to claims for payment pursuant to the CMS-855O Medicare Enrollment Application, which conditions payment on compliance with the statute, and case law that has determined that violations of the Anti-Kickback Statute are material. *See U.S. ex rel. Lutz v. Berkeley Heartlab, Inc.*, 2017 U.S. Dist. LEXIS 138722, at *9 (D.S.C. Aug. 27, 2017) (applying common sense and weight of authority).

43.    The State of Florida has its own Anti-Kickback Statute, Fla. Admin. Code 59G-1.050(11), which, *inter alia*, prohibits payment in return for referring an individual to a person for furnishing any service for which payment may be made under the Florida Medicaid program.

## FACTUAL ALLEGATIONS

44.     Orlando Health, PAL, and OHPG routinely emphasize to their physician employees that all referrals needed to be made within the "integrated network" of Orlando Health.

45.     Dr. Daouk had been working for PAL for about three years when the Orlando Health takeover occurred in 2012. At the time of the takeover, Dr. Daouk noticed that using the "integrated network" was at first merely a suggestion, which was repeated at board meetings and in reports. PAL physicians were told that they should endeavor to refer more patients to Orlando Health entities.

46.     Pretty soon, however, such referrals became a mandate, with threats made against those who failed to comply.

47.     On March 21, 2014, PAL COO Linda Zinkovich emailed Dr. Lori Grant, DPM, a PAL podiatrist who was performing surgeries at Florida Hospital, that the "[PAL] Board has asked me to remind you that you are an employee of an Orlando Health owned company and, therefore, should show some loyalty to the system. They have asked me to find out why you are still using Florida Hospital North for surgeries."

48.     Dr. Daouk was subsequently targeted for the same issue, notwithstanding that there was nothing in his employment agreement that prevented him from performing surgeries at Florida Hospital, and unlike many other PAL physicians, he treated patients at a second office that was not close to an Orlando Health facility.

49.     In November 2014, PAL informed Dr. Daouk and Dr. Grant that it was terminating their privileges with Florida Hospital, and that if they wanted to continue using non-Orlando Health facilities, they would have to obtain their own privileges and malpractice policy.

50.     When Dr. Daouk objected, PAL President Dennis Buhring responded that by performing surgeries at other hospitals, Dr. Daouk was "send[ing] a very negative message to your employer."

51.     This pressure to refer patients only to Orlando Health facilities for procedures continued to mount over the years, culminating in 2017, when PAL relocated from its Sand Lake office to a new facility owned by Orlando Health—the Orlando Health Medical Pavilion at Spring Lake.

52.     This same location also houses OHIC, a diagnostic imaging center with MRI, CT scan, and ultrasound capabilities.

53.     Images taken at OHIC—at all of its locations—are read by radiologists employed by the Medical Center Radiology Group ("MCRG").

54.     In a May 9, 2017 board meeting, at which Relator was present, Buhring emphasized to the PAL board the need to refer patients to OHIC.

55.     It was discussed at that time that some of the providers referred patients to OHIC's competitors because they provided better service. Orlando Health CEO David Strong was present at this board meeting.

56.     On May 23, 2017, Buhring sent Dr. Daouk an email specifically asking that he refer more patients to OHIC.

57.   Dr. Daouk initially tried to refer more patients to OHIC simply due to its
convenient location for his patients, but he found the quality of OHIC's service to be
unacceptable.

58.   For example, he had a difficult time opening images through OHIC's portal,
his staff would call to schedule appointments, but nobody answered the phones,
there was rarely immediate availability, and his patients complained about long
wait times.

59.   As a result of this dissatisfaction with OHIC, Dr. Daouk and his staff
continued to refer patients to imaging centers that performed fast, high quality
work.

60.   On July 20, 2017, Buhring sent PAL's office managers an email instructing
them to bar sales representatives from "outside imaging competitors" from their
offices, including all marketing materials.

61.   In August 2017, Dr. Sunil Desai was named senior vice president for Orlando
Health and president of the Orlando Health Physician Group ("OHPG"), the
specialists' group for Orlando Health.

62.   On October 18, 2017, Buhring sent Dr. Daouk an email chastising him for not
referring more of his patients to MCRG.

63.   After receiving this email, Dr. Daouk followed up with his staff, who
confirmed that their experiences with OHIC had not improved, which feedback he
shared with Buhring.

64.   On February 19, 2018, Buhring sent an email to the PAL physicians

requesting that they support MCRG, and reiterating that they needed to stop giving outside imaging center representatives access to PAL offices, noting "[w]e are now a part of Orlando Health, who has their own imaging centers, and it is crucial that we choose to use them first, and to support them in every way possible."

65. On March 22, 2018, PAL COO Linda Zinkovich informed Dr. Daouk that Dr. Desai and Orlando Health "would like you to cease performing surgery at Florida Hospital now."

66. Two months later, in May 2018, Buhring told Dr. Daouk via email that the PAL Board had voted to remove him from the board. This was in violation of PAL's group operating agreement, which required at least one board member to be a specialist.

67. On August 17, 2018, Buhring told Dr. Daouk that he could no longer work for PAL, but that if he agreed to certain conditions, he could work for OHPG.

68. As contemporaneously memorialized in an email that Buhring drafted for Dr. Daouk to send to Dr. Desai, they discussed Dr. Daouk's "need to be totally dedicated to Orlando Health (increase my surgeries at Dr. Phillips [Hospital], use all the facilities At Springlake, etc.)."

69. Dr. P. Phillips Hospital is owned by Orlando Health.

70. Buhring also gave Dr. Daouk a document from the board that listed, among others, these same conditions: (1) "Dr. Daouk will be asked to make best efforts to use the Orlando Health's Imaging Lab at Spring Lake," and (2) "Dr. Daouk needs to increase his utilization of Dr. Phillips Hospital for his surgeries."

-14-

71.    Buhring made clear to Dr. Daouk that this document was a "cleaned up" version of what they wanted him to do, carefully written to "abide by Stark," and that the reality was that if he wanted to continue working for Orlando Health, in no uncertain terms, he was required to refer imaging to OHIC and perform all his surgeries at Dr. Phillips Hospital.

72.    Dr. Terry Peppy, another member of the board, reiterated to Dr. Daouk that he would need to abide by these requirements if he wished to continue working with Orlando Health.

73.    Although Dr. Daouk believed he was being given the opportunity to work for OHPG, just two weeks later, on August 31, 2018, Buhring and Rachna Atwal (VP of OHPG) delivered to Dr. Daouk a letter purporting to terminate his employment.

74.    This decision came after Dr. Daouk continued to express a need to perform surgeries at Florida Hospital.

75.    Buhring and Atwal expressly informed Dr. Daouk that he was being terminated because he was continuing to do surgeries at non-Orlando Health facilities.

76.    Board members Dr. Alix Casler and Dr. Erik Walker subsequently informed Dr. Daouk that the decision to terminate Dr. Daouk's employment and to not let him work for OHPG was made by Dr. Desai without PAL Board involvement.

77.    Dr. Walker indicated that "it had to do with you continuing to do surgeries at Florida Hospital."

78.    This was in violation of PAL's group operating agreement,

-15-

79.    Even after Dr. Daouk's termination, Orlando Health attempted to limit his ability to perform surgeries at non-Orlando Health facilities during the transition period.

80.    PAL, Orlando Health, and OHPG offered Dr. Daouk, and continue to offer its current physicians, remuneration by way of salaried employment and the benefits related thereto in exchange for referring patients to Orlando Health facilities, in violation of the Anti-Kickback Statute.

81.    Because Orlando Health owns OHIC and Dr. Phillips Hospital, as well as OHPG and PAL, and these entities have compensation arrangements with their physicians, there exists an unbroken chain of financial relationships that renders these referrals as violations of the Stark Laws.

82.    Any claims submitted by Orlando Health or its subsidiaries, including but not limited to OHIC, to Government Healthcare Programs that resulted from improper referrals under either the Anti-Kickback Statute or Stark Laws are tainted and thus false pursuant to the False Claims Act.

83.    Because Dr. Daouk refused to violate the federal Anti-Kickback Statute, the Florida Anti-Kickback Statute, the Stark Laws, and his patients' rights to choose their provider (*see, e.g.,* 42 U.S.C. § 1395a(a) [Medicare] and 42 U.S.C. § 1396a(a)(23) [Medicaid]), Orlando Health and PAL retaliated against him by removing him from the PAL Board and terminating his employment, and Orlando Health and OHPG retaliated against him further by withdrawing their offer for him to work for OHPG.

-16-

## COUNT I
### VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)
**(All Defendants)**

84.     Relator hereby incorporates and realleges herein the allegations set forth in Paragraphs 1-83.

85.     As set forth above, Defendants Orlando Health, Physician Associates, LLC, Orlando Health Physician Group, and Orlando Health Imaging Centers, individually and by and through their agents, officers, and employees, knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval, in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

86.     Due to Defendants' conduct, the United States Government has suffered substantial monetary damages.

87.     The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of the aforementioned violations of the federal FCA, 31 U.S.C §§ 3729-3733, in an amount that will be proven at trial.

88.     The United States is entitled to a civil penalty as required by 31 U.S.C. § 3729(a) for each of the fraudulent claims and statements.

89.     Relator is also entitled to reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

## COUNT II
### VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)
**(All Defendants)**

90.     Relator hereby incorporates and realleges herein the allegations set forth in

Paragraphs 1-83.

91.    As set forth above, Defendants Orlando Health, Physician Associates, LLC, Orlando Health Physician Group, and Orlando Health Imaging Centers, individually and by and through their agents, officers, and employees, knowingly conspired to defraud the Government by getting a false or fraudulent claim allowed or paid, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

92.    Due to Defendants' conduct, the United States Government has suffered substantial monetary damages.

93.    The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of the aforementioned violations of the federal FCA, 31 U.S.C §§ 3729-3733, in an amount that will be proven at trial.

94.    The United States is entitled to a civil penalty as required by 31 U.S.C. § 3729(a) for each of the fraudulent claims and statements.

95.    Relator is also entitled to reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

## COUNT III
## VIOLATION OF § 68.082(2)(a), FLORIDA STATUTES – FLORIDA FCA
### (All Defendants)

96.    Relator hereby incorporates and realleges herein the allegations set forth in Paragraphs 1-83.

97.    As set forth above, Defendants Orlando Health, Physician Associates, LLC, Orlando Health Physician Group, and Orlando Health Imaging Centers, individually and by and through their agents, officers, and employees, knowingly

presented, or caused to be presented to the Florida Medicaid program numerous false or fraudulent claims for payment or approval, in violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(a).

98.    Due to Defendants' conduct, the State of Florida has suffered substantial monetary damages.

99.    The State of Florida is entitled to treble damages based upon the amount of damage sustained by the State of Florida as a result of the aforementioned violations of Fla. Stat. § 68.082(2), an amount that will be proven at trial.

100.    The State of Florida is entitled to a civil penalty as required by Fla. Stat. § 68.082(2) for each of the fraudulent claims.

101.    Relator is also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorneys' fees and costs, pursuant to Fla. Stat. § 68.085.

## COUNT IV
## VIOLATION OF § 68.082(2)(c), FLORIDA STATUTES – FLORIDA FCA
### (All Defendants)

102.    Relator hereby incorporates and realleges herein the allegations set forth in Paragraphs 1-83.

103.    As set forth above, Defendants Orlando Health, Physician Associates, LLC, Orlando Health Physician Group, and Orlando Health Imaging Centers, by and through their agents, officers and employees, conspired to commit a violation of the Florida False Claims Act, in violation of Fla. Stat. § 68.082(2)(c).

104.    Due to Defendants' conduct, the State of Florida has suffered substantial monetary damages.

105.    The State of Florida is entitled to treble damages based upon the amount of

damage sustained by the State of Florida as a result of the aforementioned

violations of Fla. Stat. § 68.082(2), an amount that will be proven at trial.

106.    The State of Florida is entitled to a civil penalty as required by Fla. Stat.

§ 68.082(2) for each of the fraudulent claims.

107.    Relator is also entitled to reasonable expenses which the court finds to have

been necessarily incurred and reasonable attorneys' fees and costs, pursuant to Fla.

Stat. § 68.085.

**COUNT V**
**VIOLATION OF 31 U.S.C. § 3730—RETALIATION**
**(Defendants Orlando Health, Physician Associates, LLC,**
**and Orlando Health Physician Group)**

108.    Relator hereby incorporates and realleges herein the allegations set forth in

Paragraphs 1-83.

109.    Defendants Orlando Health, Physician Associates, LLC, and Orlando Health

Physician Group violated Relator Daouk's rights pursuant to 31 U.S.C. § 3730(h) by

retaliating against him for lawful acts done by him in furtherance of an action

under the federal FCA and other efforts to stop one or more violations alleged in

this action.

110.    Relator raised multiple objections regarding Defendants' violations of the

federal False Claims Act, the federal Anti-Kickback Statute, and the Stark Law.

111.    In response to his multiple complaints, Defendants Orlando Health,

Physicians Associates, LLC, and Orlando Health Physician Group retaliated

against Dr. Daouk.

112.   Specifically, in May 2018, Buhring told Dr. Daouk via email that the PAL Board had voted to remove him from the board. This was in violation of PAL's group operating agreement, which required at least one board member to be a specialist.

113.   On August 17, 2018, Buhring told Dr. Daouk that he could no longer work for PAL, but that if he agreed to certain conditions, he could work for OHPG.

114.   As contemporaneously memorialized in an email that Buhring drafted for Dr. Daouk to send to Dr. Desai, they discussed Dr. Daouk's "need to be totally dedicated to Orlando Health (increase my surgeries at Dr. Phillips [Hospital], use all the facilities At Springlake, etc.)."

115.   Buhring also gave Dr. Daouk a document from the board that listed, among others, these same conditions: (1) "Dr. Daouk will be asked to make best efforts to use the Orlando Health's Imaging Lab at Spring Lake," and (2) "Dr. Daouk needs to increase his utilization of Dr. Phillips Hospital for his surgeries."

116.   Buhring made clear to Dr. Daouk that this document was a "cleaned up" version of what they wanted him to do, carefully written to "abide by Stark," and that the reality was that if he wanted to continue working for Orlando Health, in no uncertain terms, he was required to refer imaging to OHIC and perform all his surgeries at Dr. Phillips Hospital.

117.   Dr. Terry Peppy, another member of the board, reiterated to Dr. Daouk that he would need to abide by these requirements if he wished to continue working with Orlando Health.

118.   Although Dr. Daouk believed he was being given the opportunity to work for

-21-

OHPG, just two weeks later, on August 31, 2018, Buhring and Rachna Atwal (VP of OHPG) delivered to Dr. Daouk a letter purporting to terminate his employment.

119. This decision came after Dr. Daouk continued to express a need to perform surgeries at Florida Hospital.

120. Buhring and Atwal expressly informed Dr. Daouk that he was being terminated because he was continuing to do surgeries at non-Orlando Health facilities.

121. Board members Dr. Alix Casler and Dr. Erik Walker subsequently informed Dr. Daouk that the decision to terminate Dr. Daouk's employment and to not let him work for OHPG was made by Dr. Desai without PAL Board involvement.

122. Dr. Walker indicated that "it had to do with you continuing to do surgeries at Florida Hospital."

123. Even after Dr. Daouk's termination, Orlando Health attempted to limit his ability to perform surgeries at non-Orlando Health facilities during the transition period.

124. As a result of Defendant Orlando Health, Physician Associates, LLC, and Orlando Health Physician Group's actions, Relator Daouk has suffered damages in an amount to be shown at trial.

### COUNT VI
### VIOLATION OF SECTION 448.101 ET SEQ., FLORIDA STATUTES –
### FLORIDA PRIVATE SECTOR WHISTLE-BLOWER ACT
### (Defendants Orlando Health, Physician Associates, LLC,
### and Orlando Health Physician Group)

125. Relator hereby incorporates and realleges herein the allegations set forth in

Paragraphs 1-83.

126. Section 448.102(3), Florida Statutes, expressly provides a cause of action for any employee who has been the object of a retaliatory personnel action because the employee, *inter alia*, objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, and/or regulation.

127. Relator reported and notified Defendants Orlando Health, Physician Associates, LLC, and Orlando Health Physician Group of, and objected to and refused to participate in, activities, policies, and practices of Defendants that he reasonably believed are and/or are violations of federal and state laws, rules, and/or regulations.

128. Relator raised multiple objections regarding Defendants' violations of the federal False Claims Act, the Florida False Claims Act, the Stark Law, the federal Anti-Kickback Statute, and the Florida Anti-Kickback Statute.

129. In response to his multiple complaints, Relator suffered retaliation as set forth above that ultimately resulted in the most severe adverse action, in his termination.

130. Relator raised multiple objections regarding Defendants' violations of the federal False Claims Act, the federal Anti-Kickback Statute, and the Stark Law.

131. In response to his multiple complaints, Defendants Orlando Health, Physicians Associates, LLC, and Orlando Health Physician Group retaliated against Dr. Daouk.

132. Specifically, in May 2018, Buhring told Dr. Daouk via email that the PAL

Board had voted to remove him from the board. This was in violation of PAL's group operating agreement, which required at least one board member to be a specialist.

133.   On August 17, 2018, Buhring told Dr. Daouk that he could no longer work for PAL, but that if he agreed to certain conditions, he could work for OHPG.

134.   As contemporaneously memorialized in an email that Buhring drafted for Dr. Daouk to send to Dr. Desai, they discussed Dr. Daouk's "need to be totally dedicated to Orlando Health (increase my surgeries at Dr. Phillips [Hospital], use all the facilities At Springlake, etc.)."

135.   Buhring also gave Dr. Daouk a document from the board that listed, among others, these same conditions: (1) "Dr. Daouk will be asked to make best efforts to use the Orlando Health's Imaging Lab at Spring Lake," and (2) "Dr. Daouk needs to increase his utilization of Dr. Phillips Hospital for his surgeries."

136.   Buhring made clear to Dr. Daouk that this document was a "cleaned up" version of what they wanted him to do, carefully written to "abide by Stark," and that the reality was that if he wanted to continue working for Orlando Health, in no uncertain terms, he was required to refer imaging to OHIC and perform all his surgeries at Dr. Phillips Hospital.

137.   Dr. Terry Peppy, another member of the board, reiterated to Dr. Daouk that he would need to abide by these requirements if he wished to continue working with Orlando Health.

138.   Although Dr. Daouk believed he was being given the opportunity to work for OHPG, just two weeks later, on August 31, 2018, Buhring and Rachna Atwal (VP of

OHPG) delivered to Dr. Daouk a letter purporting to terminate his employment.

139. This decision came after Dr. Daouk continued to express a need to perform surgeries at Florida Hospital.

140. Buhring and Atwal expressly informed Dr. Daouk that he was being terminated because he was continuing to do surgeries at non-Orlando Health facilities.

141. Board members Dr. Alix Casler and Dr. Erik Walker subsequently informed Dr. Daouk that the decision to terminate Dr. Daouk's employment and to not let him work for OHPG was made by Dr. Desai without PAL Board involvement.

142. Dr. Walker indicated that "it had to do with you continuing to do surgeries at Florida Hospital."

143. Even after Dr. Daouk's termination, Orlando Health attempted to limit his ability to perform surgeries at non-Orlando Health facilities during the transition period.

144. As a direct and proximate result of Relator's legally protected objections to violations of laws, rules, or regulations pursuant to section 448.102(3), Florida Statutes, Relator was retaliated against by Defendants Orlando Health, Physician Associates, LLC, and Orlando Health Physician Group in the terms and conditions of his employment.

145. Defendants Orlando Health, Physician Associates, LLC, and Orlando Health Physician Group actively and knowingly participated in the retaliatory personnel actions against Relator because of his protected objections to and refusal to

participate in violations of state and/or federal laws, rules, or regulations in violation of section 448.101, *et seq.*, Florida Statutes.

146.   As a direct consequence of these actions, Relator suffered past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, and other non-pecuniary and intangible injuries.

147.   Relator has retained counsel to represent him in this matter and has incurred, and will continue to incur, reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendant:

   (a) awarding the United States treble damages sustained by it for each of the false claims;

   (b) awarding the United States a maximum civil penalty for each of the false claims and records;

   (c) awarding the State of Florida treble damages sustained by it for each of the false claims;

   (d) awarding the State of Florida the maximum civil penalty for each of the false claims and records;

   (e) awarding Relator thirty percent (30%) of the proceeds of this action and any alternate remedy or the settlement of any such claim;

   (f) awarding Relator all relief available, including special damages, resulting from retaliation pursuant to 31 U.S.C. § 3730(h) and/or

Section 448.102(3), Florida Statutes;

(g) compensatory damages for lost wages, benefits, and any other applicable remuneration;

(h) other compensatory damages as permitted by law;

(i) prejudgment interest;

(j) injunctive relief consisting of an order prohibiting further retaliatory action by Defendants as provided under section 448.103(2)(a), Florida Statutes; and

(k) awarding Relator litigation costs and reasonable attorneys' fees; and

(l) granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby respectfully demands trial by jury on all issues and counts triable as of right before a jury.

Respectfully submitted,

Jill S. Schwartz, Esquire
Florida Bar No. 523021
John M. Hunt, Esquire
Florida Bar No. 91168
**Jill S. Schwartz & Associates**
655 West Morse Boulevard, Suite 212
Winter Park, Florida 32789-3745
Telephone: (407) 647-8911
Facsimile: (407) 628-4994
jschwartz@schwartzlawfirm.net
jhunt@schwartzlawfirm.net

Julie Bracker
Georgia Bar No. 073803

-27-

Jason Marcus
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3225 Shallowford Road, Suite 1120
Marietta, Georgia 30062
Telephone: (770) 988-5035
Facsimile: (678) 648-5544
Julie@fcacounsel.com
Jason@fcacounsel.com

## <u>VERIFICATION</u>

Personally appeared before the undersigned, AYMAN DAOUK, M.D., who being first duly sworn, deposes and says that the allegations of this Verified Complaint and Demand for Jury Trial consisting of Paragraphs 1 through 147, inclusive, are true and correct to the best of his knowledge, information, and belief.

_____

AYMAN DAOUK, M.D.

STATE OF FLORIDA     )

COUNTY OF ORANGE   )

The foregoing instrument was acknowledged before me this __30th__ day of __April__ , 2019, by AYMAN DAOUK, M.D., who is personally known to me or ☒who has produced __Florida drivers license__ as identification, and who did take an oath.

_Jane M. Tacktill_

Notary Public--State of Florida at Large

My Commission Expires: __12/14/22__

JANE M. TACKTILL
MY COMMISSION # GG 273934
EXPIRES: December 14, 2022
Bonded Thru Notary Public Underwriters



JADE M. TACKETT
MY COMMISSION # GG 273834
EXPIRES: December 14, 2022
Bonded Thru Notary Public Underwriters